IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| KIWI.COM, INC. and KIWI.COM, | § | |
| S.R.O., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT

Plaintiff American Airlines, Inc. ("American"), through its attorneys, brings this action against defendants Kiwi.com, Inc. and Kiwi.com, s.r.o. (together, "Kiwi") and respectfully alleges as follows:

### INTRODUCTION

1.      By this suit, American seeks monetary and injunctive relief against a rogue online travel agent, Kiwi, that holds itself out as an American agent with the authority to sell tickets on American flights.  Kiwi does so through a broad array of deceptive ticketing practices that causes untold harm on American and its ability to serve its customers.  From 2018–2020, Kiwi was an American travel agent with actual authority to distribute and sell tickets and related services to American's passengers.  But Kiwi repeatedly violated the agreed terms of its agency agreement through similar abusive ticketing practices, and American terminated Kiwi's authority to issue tickets on American's behalf.  Since then, completely lacking authority but undeterred, Kiwi has continued, on an ongoing basis up through the present, to hold itself out as an American agent, to

sell tickets for American flights, attempting to Bind American to contracts of carriage even though Kiwi has no authority to do so.

2.      As bad, and relatedly, Kiwi has surreptitiously gained access to American's valuable and proprietary fare, schedule and inventory content, that only authorized American agents, and others authorized by American, are permitted to access.  Without authorization, and by improper means, Kiwi has obtained, used, made available for searching via Kiwi's own website, and otherwise misappropriated this protected, valuable and proprietary American content.

3.      Kiwi deploys at least two improper paths for selling American tickets.  By one path, Kiwi acquires tickets and sells them to passengers via American's direct-to-consumer website AA.com, in repeated violation of the terms of that website; in the process, Kiwi uses fictitious email addresses and substitutes its own credit card information where the passenger's payment information is required.  By a second path, Kiwi operates by subterfuge through American's actual authorized agents, including consolidators like USA Gateway, Inc. dba GTT International ("GTT"), issuing tickets that are designed to appear to American as if they were issued by those authorized agents, and thereby inducing repeated violations of those authorized agents' duties to American.

4.      While deploying these two paths, Kiwi wrongfully holds itself out to consumers as American's agent, making contracts of carriage between American and passengers that only an authorized American agent would have authority to make.  But Kiwi is not an authorized agent for American.  At the same time, Kiwi misappropriates American's valuable proprietary fare, schedule and inventory content, makes that content available to be searched on Kiwi's website, and improperly displays American's trademarks and copyright-protected Flight Symbol. But only

those travel agencies authorized by American to act on American's behalf—those with "plating authority"—may access and use American's valuable proprietary fare, schedule and inventory content, may bind American to contracts of carriage with passengers, and may use American's valuable trademarks and copyright.

5.       As described in more detail below, consolidators like GTT knowingly participate in Kiwi's wrongful conduct, assisting Kiwi by providing unauthorized access to American's tickets, fares and schedules to allow Kiwi to sell American tickets to passengers, and executing those transactions in a way that is difficult for American to trace back to Kiwi.  By doing so, Kiwi induces GTT wrongfully to participate in Kiwi's breaches of duties, and at the same time induces GTT to breach its own contractual agency duties to American.

6.       Kiwi misrepresents to the public that it is authorized to sell American's products and services, and its practices create various difficulties for American and its customers.  Kiwi tickets flights, without authorization, for American, attempting to create agreements—contracts of carriage—between American and its passengers.  Kiwi books these tickets via practices American has explicitly forbidden, meaning Kiwi is attempting to bind American to contracts it *does not want*. American bears all requirements and risks of performance under these unwanted contracts, while Kiwi bears no responsibility to the passenger or to American for its actions.  If a flight or flight segment goes unused because Kiwi booked a forbidden "hidden city" ticket, American bears the loss from this wasted inventory.  Problems that Kiwi creates are left for American and for the passenger to bear or to resolve.

7.       Kiwi hides its tracks, with the assistance and participation of GTT and others, changes pathways, and otherwise has eluded American's efforts to stop Kiwi's abusive practices. Relief from this Court therefore is necessary. Southwest Airlines previously secured preliminary

and permanent injunctive relief against certain of Kiwi's abusive practices in this Court.  *See Southwest Airlines Co. v. Kiwi.com, Inc.*, 3:21-cv-98, 2021 WL 4476799 (N.D. Tex. Sept. 30, 2021) (preliminary injunction); *id*. at Dkt. No. 126 (permanent injunction).  By this action, American seeks similar injunctive relief and monetary damages.

### NATURE OF THE CASE[1]

8.     For many decades, airlines such as American have authorized certain travel agencies to issue tickets—binding contracts of carriage—to passengers on the airline's behalf. Like all agency relationships, these relationships are built on reputation, trust and confidence, give rise to agency duties, and can be modified or terminated by the principal—in this case, American.  In this relationship, the agency has no inventory of its own, does not control any inventory, fare, or schedule content, and never itself "owns" any ticket.  Rather, American creates and dynamically structures that content and inventory, takes reasonable measures to maintain data confidentiality and integrity, while incurring significant effort and expense to do so.  American bears continuing responsibility for the accuracy of the content and inventory, and for the air transportation and related services for which passenger ticket based on such content and inventory.  American has sole say as to its fares, including fare rules, schedules and inventory content, the ticket, its fulfillment or its cancellation, and the conditions or terms of carriage, and of course American, and not Kiwi, is the party who can  perform the contract.  If there is some problem with the ticket or the flight, the airline, not the agency, is responsible to the passenger and possibly regulatory authorities.  The agency works as a true extension of the airline for purposes of forming the contract of carriage, and strictly subject to the limits of the authority granted by the airline to do so, unless and until its agency is terminated.

---

[1] A reference list of acronyms used in this Complaint is attached as Appendix A.

9.      To regularize and simplify the process for travel agents to become authorized agents, certain member airlines established an international airline association and a domestic airline corporation: the International Airline Transport Association ("IATA") and the Airlines Reporting Corporation ("ARC"), respectively.  Travel agency applicants seeking to do business from international (ex-United States) points of sale can submit a single application to IATA, rather than to each member airline.  Travel agency applicants seeking to do business from United States points of sale can submit a single application to ARC.  By such applications, travel agencies agree to certain standard agency terms, with their agency appointment subject to consent, declination or termination by each airline, and subject also to supplemental terms required by each such airline.  Taken together the governing ARC and/or IATA travel agency agreements and American's addenda to those agreements are referred to in the industry as the "Governing Travel Agency Agreements" or "GTAA."

10.     In 2016, Kiwi applied for and received accreditation as a travel agency from IATA. IATA has a standard form contract with basic terms that govern the relationship between these accredited agents and IATA-member carriers who have agreed to appoint them, unless and until terminated.  As part of the accreditation process, Kiwi agreed to be bound to all of the provisions of the GTAA.

11.     The GTAA contain important instructions and limitations on the use of American's proprietary and valuable fare, schedule and inventory content.  Access to and display of that content is limited to authorized American agents, and such agents are themselves bound by important limitations.  For example:

8. Data Ownership and Use.
(a) Background. The creation, development, collection, verification, formatting, organizing and maintenance of fares, schedule, inventory, merchandising and other pre-booking data about American's products, services and facilities requires

extensive investment of time, money and specialized resources of American.  For example, American expends significant amounts of time and money to (i) analyze markets and competition for air transportation and related products and services, (ii) analyze aircraft fleet types and utilization, (iii) analyze operating conditions at airports and air traffic control infrastructure, crew scheduling requirements and legal/regulatory requirements, (iv) develop, deploy and use proprietary algorithms, processes and techniques, many of which have taken years to develop and are critical to American's competitiveness, and (v) train its personnel to become skilled and knowledgeable about each of the foregoing.  This investment in pre-booking data also results in post-booking data about American's products and services and the customers who purchase and consume them, and therefore American's post-booking data is similarly valuable and competitively sensitive. *The integrity, value and availability of American's pre- and post-booking data can only be preserved if it is accessed and used in ways that have been authorized by American. Unauthorized access can cause disruption and harm to American's systems, business and customers, and misuse of such data can lead to safety and security issues, as well as cause material commercial harm to American.*

(b) American Data. Agent understands and agrees that as between American and Agent and as a consequence and condition of Agent's Appointment, any information or data, regardless of source or format, that (i) identifies American (e.g., American's trademarks), (ii) identifies or is reasonably identifiable to services or products provided by American, including all fare and inventory information, (iii) relates to a relationship between a customer and American (e.g., frequent flyer or club membership), (iv) relates to a transaction between a customer and American, including booking and payment data, (v) is passed by Agent to American through a PNR or similar booking/sale record, or (vi) is passed by or on behalf of American to Agent in connection with this Agreement, ((i) to (vi) collectively, "American Data"), is and will be owned by American and is Confidential Information of American. Any successors, equivalents, compilations or derivatives of the foregoing, whether now known or hereafter devised, and in any medium or format, are also American Data.  *Access and use of American Data by the Agent is solely for purposes of and is limited to those activities that are within the scope of the principal-agent relationship as defined and authorized by American for all of Agent's Locations.*

(c) Examples of Unauthorized Activities.  *Any use of American Data beyond what is permitted in Section 8(b) above is unauthorized.*  As guidance, American provides the following examples of specific types of access, use, distribution and remarketing of American Data that are prohibited without prior written consent from American: (1) accessing AA.com by the use of any automated or electronic devices commonly known in the Internet industry as robots or spiders, or by the use of other electronic search devices; (2) soliciting, facilitating, encouraging or agreeing to provide access to or otherwise remarket or redistribute, or take affirmative steps to allow or permit such access to, or remarketing or redistribution of, any American Data to any third party, through

any process, including screen scraping, spiders, web "bots" or other device, software or system; (3) licensing, selling, or otherwise providing to any person or entity any software or other device that is capable of accessing American Data from any source; or (4) editing, modifying, creating derivatives, combinations or compilations of, combining, associating, synthesizing, reverse engineering, reproducing, displaying, distributing, disclosing, or otherwise processing American Data; (5) engaging in any kind of commercialization, marketing, advertising, licensing or resale that is based on American Data (e.g., advertising credit card offers to consumers based on the American Marks or flight information) except as otherwise permitted by this Agreement; (6) facilitating structured posting of American Data to any third party electronic media, including without limitation Facebook, Twitter, online calendars; (7) accessing American Data from any unauthorized source which American may identify to Agent; (8) directly or indirectly using functionality to automatically poll American's inventory systems at an excessive rate; and (9) assisting, aiding, or abetting in any way the unauthorized access, use, distribution or display of American Data, including American Data obtained or derived from an American website or mobile app or any other web site, mobile app or any other source, such as a Global Distribution System. Agent may not engage in any of the above examples, or any other unauthorized access, use, distribution or remarketing of American Data, without the prior written authorization of American.  Agent is not authorized to agree to third party terms and conditions which would assign, transfer, or license American Data or American's proprietary rights in American Data to a third party or otherwise negatively impact American's proprietary rights to American Data.  If Agent learns that any third party is accessing, distributing, remarketing or displaying American Data in any way obtained via Agent, including Agent's web site, without American's written authorization, Agent will promptly inform American and take all commercially reasonable measures, including commercial, technological, or legal measures, to prevent the unauthorized access, display, remarketing or distribution of American Data. Agent further agrees not to use, or authorize use of, American Data in any manner that is harmful to American.

(d) Other Data. … *Agent acknowledges and agrees that information that is specific to American's flights, products and services including fares, schedules, inventory, AA PNR data and AA TCN data, are unique to American's business, are not part of Agent's proprietary data and remain American Data even if such data elements are collected in the course of Agent's operations.*

…

(Emphases added.)

12.     The GTAA also prohibit certain abusive ticketing practices.  For example, The GTAA provide that "Agent acknowledges that Hidden City . . . and other Fraudulent, Fictitious,

or Abusive Bookings, violate American's Rules (See American's Conditions of Carriage for definitions of these types of bookings.)."  Under American's Conditions of Carriage, prohibited booking practices include: "Purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing) … Combining 2 or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing)."  Relatedly, Rule 65(A)(3)(a) of American's General Rules of the International Tariff, also linked on AA.com, provides that "Tickets may not be purchased at a fare(s) published from an initial departure point on the ticket which is before the passenger's actual point of origin of travel, or to a more distant point(s) than the passenger's actual destination being traveled even when the purchase and use of such tickets would produce a lower fare.  This practice is known as 'hidden cities ticketing' . . . and is prohibited by AA."

13.     In 2017, American became aware of unauthorized and abusive sales activities by Kiwi and demanded that Kiwi cease and desist these activities.  In or about April 2018, in an effort to resolve their differences and to formalize certain sales commission amounts, Kiwi and American entered into a direct Agency Program Agreement.  In Section 7.7 of that 2018 Agency Program Agreement, Kiwi explicitly reaffirmed that it would comply with applicable terms of the GTAA.

14.     As an accredited and approved agent for American, Kiwi had access to American's valuable real-time flight and ticket-pricing content.  Kiwi also had the right to sell American tickets and related flight services as American's agent in accordance with American's instructions and policies.

15.     Despite agreeing to comply with American's instructions and policies, Kiwi recommenced its practices of flouting numerous rules and requirements of the GTAA.  Kiwi's

abusive actions were in breach of the GTAA, significantly harmed American's customers—through consumer confusion, disruptions in services, and operational delays and problems—and damaged American's relationships and reputation with its customers. American discussed these problems with Kiwi in 2019 to give Kiwi a chance to mend its ways, to no avail.

16.     American therefore notified Kiwi in 2020 that it was terminating Kiwi's authorization to sell American flights and fares, as American was entitled to do under the GTAA. In February 2022, American and its partners British Airways, Finnair and Iberia publicly announced to the airline industry, including GTT, that they had revoked Kiwi's agency appointment, and directed all authorized agents, including GTT, to cease issuing tickets on behalf of Kiwi.

17.     But Kiwi has been undeterred. Despite lacking any authority to access and use American's valuable, dynamic flight, fare and inventory content, Kiwi found improper means to do so, feeding that content to Kiwi's website.  Likewise without authority to sell American's flights and fares as American's agent, Kiwi continued to do so: displaying American's flights, trademarks and copyrighted symbol on its website as if Kiwi were still authorized as American's agent, and selling American flights by various subterfuges, thereby continuing to harm American and American's customers.

18.     By one pathway, as mentioned above, Kiwi sells American's flights by purchasing tickets in the name of the customer through American's direct-to-consumer website, AA.com. The AA.com website has contractual terms of use, included in legal information linked on the home page, the terms of which are accepted and agreed to by using the website ("Use Agreement").  Kiwi clearly is familiar with such terms of use, as Kiwi's own website, Kiwi.com,

has its own terms of use. And, in fact, to book tickets through the AA.com website, Kiwi affirmatively had to check a box confirming its acceptance of American's conditions of carriage.

19.     Critically, AA.com's Use Agreement explicitly states that AA.com is solely for personal, non-commercial use.  The Use Agreement also prohibits, among other things: making an abusive reservation in violation of American's conditions of carriage.  Abusive practices include making a reservation where the passenger does not intend to fly all flight segments (a practice known as hidden city ticketing), booking through the website for any person who is not a member of the user's immediate household or the user's direct work supervisor, and misrepresenting or omitting the origin or source of any information uploaded to the site.  But Kiwi violates all of these terms, and more.  Kiwi uses the site for commercial, not personal, use; it actively encourages and books hidden city tickets; it books for others outside the exceptions for family members and work supervisors; and while Kiwi books tickets using the passenger's name, it does not supply the passenger's credit card information and contact email address, using instead Kiwi's own hard-to-trace payment information and auto-generated fictitious email addresses.

20.     These violations harm not only American but also consumers.  When a passenger is late arriving for the final segment of a flight, American might delay the flight unnecessarily while looking for the passenger.  If the passenger still doesn't show, American needs to determine whether the passenger has checked luggage through to the final destination, because if the passenger has, the luggage needs to be removed from the plane as a serious security matter, potentially causing a flight delay.  When the passenger does not show up for the second leg of her flight, the rest of her itinerary is automatically cancelled; she therefore runs into trouble when she tries to board her return flight home and does not have a valid ticket.  In addition, without passenger contact information, American is unable to communicate with passengers concerning

canceled or delayed flights, gate changes, and the like.   Without passenger credit card information, American is unable to refund the passenger directly, and the customer instead needs to chase down her refund from Kiwi, because American likely refunded by way of credit to the source of payment that Kiwi supplied.

21.    Kiwi also misleads American's passengers, leading to significant potential problems for those passengers and for American. For example, Kiwi often collects its own luggage charges for checked bags, without notifying or making any arrangement with American. It has done so even in situations where American does not charge for checked bags and the passenger could have transported her luggage with no charge at all.  In any event, without an arrangement by which such fees could be notified or posted to American, American has no way to know about or recognize the charges imposed by Kiwi.  A customer therefore who paid Kiwi for its luggage, in situations where American would charge such a fee, ends up thinking that she has paid for her bags, but arrives at the airport and learns that she has not.

22.    By a second pathway, when Kiwi does not book through AA.com, Kiwi operates underground by selling American tickets using the ticketing authority of certain authorized consolidator agencies that Kiwi apparently has formed relationships with.  Unauthorized sales by Kiwi made using the ticketing authority of consolidator agencies like GTT appear to American to be sales made by the consolidator agency, not Kiwi, but ultimately are funneled to Kiwi and passed on to Kiwi's customers.

23.    These shadow sales by Kiwi induce breaches of GTAA provisions by which authorized consolidators have agreed not to issue tickets for any unauthorized agency.  Thus, by executing sales for Kiwi, consolidator agencies not only are participating in Kiwi's breaches of agency duties to American, they also are breaching their own agreements with American included

in the GTAA. As with Kiwi's purchases made on AA.com, Kiwi's unauthorized sales made through such consolidators often include hidden city tickets and have caused similar problems for passengers and American.

24.     Although Kiwi's means and operations are often secretive and hidden, involving subterfuge and misrepresentation, Kiwi's goals are open, notorious, and brazen.  Disruption and violation of airline industry agreements are its business model.  See www.kiwi.com/stories/category/travel-hacks/ (accessed on July 14, 2023):

> Travel hacks
>
> We hack the system, you fly for less: that's Kiwi.com's motto.  Here's where we round up our travel hacks.  Everything from cheap flight tickets, flight booking hacks, the best ways to save money, and even a few secret hacks and tricks the airlines don't want you to know!
>
> We're proud of our travel hacks here at Kiwi.com.  Our powerful travel search with flexible filters can show you destinations you'd never even thought of, while hacks like Hidden Cities, throwaway ticketing, Price Alerts, flexible fares, self-transfer, and our unique Nomad multi-city search give you more options to book your perfect trip.  Avoid hidden fees, save money, and book cheap flights using Kiwi.com.

25.     Kiwi boldly boasts about its wrongful misappropriation of proprietary fare, schedule and inventory content from airlines including American, using its "Kiwi-code" software.

*See* www.kiwi.com/us/cheap-flights/travel-hacks (accessed on July 14, 2023):

> Technology that makes travel cheaper and simpler for everyone
>
> It all starts with Kiwi-Code — our one-of-a-kind computer code — that we developed to hack the travel system so that you and everyone else can travel more often, for less.
>
> Kiwi-Code sees 95% of all the flights from around the world and performs over 50 billion flight price checks every day to give you the most up-to-date search results, always.  What does that mean for you?  It's simple: you get more travel search results than you would anywhere else.  You see the deals and travel options that airlines don't want you to see and other search engines can't even find.  This is how, when you book with Kiwi.com, you're getting some of the best travel deals on the internet.

26.     By its actions, Kiwi has breached agency duties including by holding itself out and acting as American's agent without authorization, breached the AA.com Use Agreement, breached the GTAA, tortiously interfered with and induced breaches of American's agreements with authorized agencies, infringed and diluted American's trademarks, misappropriated and misused American's valuable proprietary content, unjustly enriched itself by selling American's flights, and otherwise is liable pursuant to the additional causes of action pleaded herein.  By its actions executing sales for Kiwi, authorized agencies and consolidators are participating and assisting in Kiwi's breaches of agency duties to American, and also breaching their own agreements with American included in the GTAA.

27.     American has tried to thwart, terminate and mitigate Kiwi's unauthorized abusive practices. But each time one avenue is cut off, Kiwi looks for and finds another.  Only an injunction from this Court, which can be enforced with the threat of serious sanctions, can fully end Kiwi's misconduct.  In addition to a permanent injunction, American also seeks statutory damages, and disgorgement of Kiwi's profits.

## PARTIES

28.     American is a Delaware corporation with its worldwide headquarters in this District at 1 Skyview Drive, Fort Worth, Texas 76155.

29.     Over its 90-year history, American has developed hard-earned global name recognition and goodwill, and has become a leading household brand.  A key driver of its success has been its investment in its products, customer service, brand, and intellectual property. For decades, it has used and continues to use the trade name "American Airlines," and iconic trademarks and service marks.  Its brands, trade names, and other intellectual property are the result of significant investment and worth billions of dollars.

30.     American has introduced many innovations in travel over the years, including the first computer system for automating reservations and the first global alliance of air carriers.  In its role as a long-time innovator in the industry, American launched its website, AA.com, in 1995. AA.com offers end-user customers flights, ticket data, reservation details, booking options, and other travel services. American has long controlled access to AA.com and, in doing so, prohibits travel agencies or other businesses from the unauthorized sale of American flights through that portal. Among other things, the terms of use for AA.com prohibit the use of AA.com for any commercial purpose without American's express authorization.

31.     Defendant Kiwi.com, Inc. is a Delaware corporation organized under Delaware law. Its principal place of business is located at 1221 Brickell Avenue, Suite 1115, Miami, Florida 33131.  Despite doing business in the state of Texas, Kiwi.com, Inc. has not designated a registered agent for service of process in Texas. Kiwi.com, Inc. may be served with process through either (a) its Delaware registered agent, Northwest Registered Agent Service, Inc., 8 The Green, Suite B, Dover, Delaware 19901; or (b) its Florida registered agent, Northwest Registered Agent Service, Inc, 7901 4th St. N, Suite 300, St. Petersburg, Florida 33702. Alternatively, Summons and Complaint may be served upon the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service pursuant to Tex. Civ. Prac. & Rem. Code § 17.044. The Texas Secretary of State may serve Kiwi.com, Inc. at 1221 Brickell Avenue, Suite 1115, Miami, Florida 33131, or via the registered agent for service of process it has designated for Delaware and/or Florida.

32.     Defendant Kiwi.com, s.r.o. is a Czechoslovakian limited liability company based in the Czech Republic, identifying its address as Palachovo náměstí 797/4, Brno 625 00. Kiwi.com, s.r.o. can be served at that address via the Hague Convention pursuant to Fed. R. Civ.

P. 4(f)(1). The Czech Republic has designated the Ministry of Justice of the Czech Republic, Vyšehradská 16, 128 10 Praha 2, Czech Republic as the Central Authority for service of process via the Hague Convention.

33.     Kiwi.com, Inc. and Kiwi.com, s.r.o. appear to act interchangeably, and as each other's agent. Together, Kiwi.com, Inc. and Kiwi.com, s.r.o. constitute an online travel agency that operates the website Kiwi.com to sell tickets for flights operated by American and other carriers. Kiwi claims that it "uncovers cheap travel options that others simply can't find" and uses "secret hacks and tricks the airlines don't want you to know." Kiwi has an "F" rating from the Better Business Bureau—with a 1.03 out of 5 star ranking by 136 customers. The internet is replete with customer complaints about Kiwi's business practices and poor customer service.

**JURISDICTION AND VENUE**

34.     The Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121(a), and 28 U.S.C. §§ 1331 and 1338, given American's trademark and copyright claims.  The Court has supplemental and pendent jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

35.     This Court has personal jurisdiction over Kiwi.com, Inc. and Kiwi.com, s.r.o.  By accessing and booking tickets over AA.com, Kiwi.com agreed to AA.com's Use Agreement, which includes an acknowledgement that the terms of the site constitute an agreement "made and entered into in Tarrant County, Texas," and which provide that Texas law governs any dispute arising from use of the site. Moreover, as described in more detail above and below, Kiwi by its acts and agreements assumed and thereby became bound to, and is estopped from avoiding, all of the provisions and instructions in the GTAA, which provided in relevant part at the time of the alleged underlying events:

> The laws of the State of Texas and the United States of America will govern the entire relationship between American and Agent including all disputes that may arise between American and Agent regarding the formation, interpretation or enforcement of these instructions or the Agreement. Agent hereby submits and consents to the *exclusive jurisdiction of the United States District Court for the Northern District of Texas* and the courts of the State of Texas for all these disputes and *waives any claim of lack of jurisdiction or forum non conveniens.*

(Emphasis added.)

36.     The Court has personal jurisdiction over Kiwi for the additional reasons that Kiwi has committed torts in this State, breached contracts and duties entered into and governed by the laws of this State, harmed American in this State, and violated Texas statutory law. It has done and still does business systematically in this State. Kiwi sought and was granted an agency relationship, with its principal, American, located in Texas. Even after American terminated Kiwi's agency authority, Kiwi continues to act with apparent, although not actual, authority, injuring its Texas-based principal.

37.     Kiwi books tickets for, among others, Texas-based customers; for one recent year alone, American has been able to identify over 70 tickets with Kiwi's fingerprints having itineraries that start and end in Texas, which therefore inferentially are for Texas residents. In addition, one of the major consolidator agencies whose PCCs Kiwi improperly uses to sell American tickets, GTT, maintains its headquarters in Plano, Texas.

38.     Kiwi thereby purposefully availed itself of this forum by soliciting business from Texas residents and directing its actions towards Texas and this District. This includes offering and selling flights to Texas residents, and engaging Texas-based third parties to book travel for certain passengers. Kiwi's website moreover offers and sells American flights to at least 19 Texas cities. By these actions, Kiwi could reasonably anticipate being hauled into court here to answer for its actions. The injuries Kiwi inflicts on American are felt in Texas and in this District, and Kiwi knew that serious harmful effects from its conduct would occur here.

39.      Both Kiwi entities have contacts with Texas. When a Texas user visits Kiwi.com, Kiwi sends targeted promotional emails with a curated list of fare deals asking, "There are loads of deals from Dallas right now, and we've organized them by price for you. But, these offers are for a limited time only, so click now to discover where you can go – no matter your budget!" This email is sent by Kiwi.com s.r.o. As alleged above, Kiwi.com, Inc. and Kiwi.com s.r.o. appear to act interchangeably, and as each other's agent. This arrangement is memorialized by the terms and conditions on Kiwi's website (www.kiwi.com/en/pages/content/legal):

1.3 Your relationship with Kiwi.com

1.3.1 Whenever we mention "Kiwi.com," "we," "us," and "our," we mean either:

(a) Kiwi.com s.r.o., with a registered office at Lazaretní 925/9, Zábrdovice, Post Code 615 00 Brno, the Czech Republic, Company ID No.: 29352886, registered in the Commercial Register maintained by the Regional Court in Brno, File No. C 74565, Tax ID No. CZ29352886, or

(b) Kiwi.com Inc. with a registered office at 1221 Brickell Avenue, Suite 1115, Miami, Florida, 33131, United States, if you fulfill the following criteria: (i) your payment is made by a credit/debit card from Visa or Mastercard and is issued by US bank/registered issuer, and (ii) you make the payment for the respective Kiwi.com Service in USD currency.

Thus, according to Kiwi, whenever a Texas resident purchases a ticket on Kiwi.com and pays using a Visa or Mastercard credit card, the Texas resident is transacting with Kiwi.com, Inc. And according to Kiwi, whenever a Texas resident purchases a ticket on Kiwi.com and pays using any other (e.g., American Express or Discover) credit card, the Texas resident is transacting with Kiwi.com s.r.o.

40.      Venue is proper in this District under 28 U.S.C § 1391. All defendants are deemed to be residents of this State because the Court has personal jurisdiction over the claims against them. *See id.* § 1391(c)(2). The claims in this action also arose in this District, and a substantial part of the activities, conduct, and damages have occurred in Texas. Kiwi.com s.r.o. is a foreign

entity, not a resident of the United States, that may be sued in any district. Defendants also agreed to venue in the AA.com Use Agreement and the GTAA.

41.     In the Southwest case, this Court exercised personal jurisdiction over both Kiwi.com, Inc. and Kiwi.com, s.r.o., over Kiwi.com, s.r.o.'s objection.

**FACTUAL ALLEGATIONS**

### A.     American's Operations and Content

42.     Fort Worth-based American is one of the world's premier airlines. Driving its success have been long-term investments in its fleet, information technology systems, personnel, industry partnerships, and customer service. Over its more than 90-year history, American has grown to be the largest commercial airline in the world, with the greatest number of passengers carried, the most revenue passenger miles flown, and the largest fleet of planes. American has carefully built and protected its global name recognition and goodwill, establishing itself as an industry innovator with reliable, quality customer service and valued customer relationships.

43.     In the 1950s and 1960s, American, with assistance from IBM, developed the first computerized reservation and ticketing system, which became known as SABRE (Semi-automated Business Research Environment). Sabre was spun off from American in 2000.

44.     Consistent with its role as a long-time innovator in the industry, American was one of the first companies to launch a loyalty program, rewarding frequent travelers with special privileges, such as free upgrades, discounted tickets, and frequent-flyer miles. American launched its loyalty program, named AAdvantage®, forty years ago. It quickly became a model for loyalty programs in the industry and has been for decades. American has developed its distinctive AAdvantage® brand and program through significant work and investment. American's customer-focused innovations have helped it earn five-star awards by the Airline Passenger Experience Association, among other recognitions.

45.     American developed its consumer-facing website, AA.com, in 1995 to improve and expand its services. With an easy-to-use interface, AA.com serves as the primary hub for end-user customers to shop for and book travel on American flights, and to perform many other flight-related and travel-related activities. The site provides time-sensitive flight and fare data to actual and potential end-user customers in an interactive format.

46.     American has invested significant resources to develop, maintain, and distribute to authorized users its flight, fare and inventory content. The content changes continually, of necessity and in reaction to changing business conditions; it is generated dynamically. The products offered to a particular customer at each moment in time depend on many variables, including available inventory, departure dates and times, demand, and competition. This valuable content is carefully protected and all reasonable measures are taken to keep the information secret. American selectively provides this information to authorized agents only, and to certain other authorized recipients, under strict terms and conditions, including prohibitions against sharing that content with unauthorized agents.

47.     The creation, development, collection, verification, formatting, organizing and maintenance of fares, schedule, inventory, merchandising and other content relating to American's products, services and facilities has required extensive investment of time, money and specialized resources of American. For example, American expends significant amounts of time and money to (i) analyze markets and competition for air transportation and related products and services, (ii) analyze aircraft fleet types and utilization, (iii) analyze operating conditions at airports and air traffic control infrastructure, crew scheduling requirements and legal/regulatory requirements, (iv) develop, deploy and use proprietary algorithms, processes and techniques,

many of which have taken years to develop and are critical to American's competitiveness, and (v) train its personnel to become skilled and knowledgeable about each of the foregoing.

48.     These efforts, and the value of American's content, are described in the GTAA, as quoted in detail above. They undergird the limitations for use of such content by authorized American agents only, and even such authorized agents are limited in the purposes and manner of permitted use.

49.     As further described in the GTAA, unauthorized access can cause disruption and harm to American's systems, business and customers, and misuse of such content can lead to safety and security issues, as well as cause material commercial harm to American.

**B.     Contractual Terms and Conditions Relating to AA.com**

50.     To protect its valuable flight/fare content, American requires visitors to AA.com to agree to terms governing use of the site. American thereby makes its site and data available for end-user consumer access and use subject to the AA.com Use Agreement. The Use Agreement confirms that the information displayed is owned by American. An interactive link appearing on the homepage and most pages of AA.com references "Legal, privacy, copyright" information, and thereby links to the Use Agreement governing use of AA.com.

51.     The Use Agreement provides terms and conditions under which users may access and use AA.com: "In return for gaining access to the Site and using it, you agree to be bound by the following Agreement without limitation or qualification, so please carefully review this Agreement before proceeding. *If you do not intend to be legally bound by these terms and conditions, do not access and use the Site.*" (Emphasis added.) Because access or use of AA.com constitutes acceptance, the Use Agreement is a valid and enforceable contract between American and those who access and use the website. The Use Agreement provides that it is "made and entered into in Tarrant County, Texas," and users agree "that Texas law governs this Agreement's

interpretation and/or any dispute arising from your access to, dealings with, or use of the Site."

When Kiwi accesses and uses AA.com to book flights, Kiwi becomes bound by the terms of the

Use Agreement.

52.    Consistent with American's overall rigorous protection of its valuable proprietary

data, the Use Agreement provides that American owns the data displayed on AA.com, and users

may not use any such information for their own commercial gain. As provided in the Use

Agreement,

a.    All "information," including "data," "screens," and "Web pages . . . appearing on the Site are the exclusive property of American."

b.    Users "may not copy, display, distribute, download, . . . publish, . . .reuse, sell, transmit, . . . or otherwise use the content of the site for public or commercial purposes."

c.    American "provides the Site solely to permit you to determine the availability of goods and services offered on the Site and to make legitimate reservations . . . , and for no other purposes. The Site is for your personal, non-commercial use."

d.    AA.com users agree not to "misuse the Site." This includes, among other things, (a) using the site to "[c]opy or create derivative works from, display, distribute, license, perform, publish, recreate, reproduce, sell, transfer, or transmit any information, products, services, or software obtained by, from, or through the Site," (b) to "[m]onitor or copy any Content by using any manual process, or any robot, spider, or other automatic device," (c) to "[m]isrepresent or omit the origin or source of any file you download or upload," or (d) to "[a]ct as an agent or attorney in fact for any person who is not a member of your immediate household; or your direct supervisor at your place of employment."

53.    The Use Agreement incorporates American's conditions of carriage which are also

linked on AA.com. These conditions include the following provision regarding ticket validity:

"Your ticket is valid only when: Travel is to/from the cities on your ticket and in your trip record."

The conditions of carriage also specify various prohibited booking practices. For example,

"[r]eservations made to exploit or circumvent fare and ticket rules are prohibited. Examples

include (but are not limited to): Purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing)."

> ### C.     Additional Contractual Agreements Binding Kiwi

54.     Outside of the limited data available on American's AA.com direct-to-consumer portal, American permits access to its flight, fare and inventory content, and permits sales of its ticketed flights and ancillary services, only by those travel agencies which are authorized, subject to agreed contractual terms and conditions.

55.     IATA accredits travel agencies with points of sale abroad, and ARC similarly accredits travel agencies with points of sale in the United States, to sell airline tickets on behalf of carriers who have authorized those agents. Kiwi directly applied for and obtained accreditation from IATA in 2016. Kiwi thereby agreed to be bound to all of the provisions of the standard-form Passenger Sales Agency Agreement that IATA facilitates between IATA-accredited agents and IATA member airlines, including American. The Passenger Sales Agency Agreement that arises is explicitly a contract with and for the benefit of IATA member airlines including American.

56.     In parallel, Kiwi has operated and issued shadow bookings through certain ARC- and IATA-accredited agencies. One such consolidator agency through which Kiwi has issued tickets is GTT. By virtue of its shadow activities through ARC-accredited agencies such as GTT, Kiwi assumed and thereby became subject to and bound by, and is estopped from avoiding, all of the limitations and obligations in the ARC Agent Reporting Agreement that ARC facilitates between carriers and agents. The ARC Agent Reporting Agreement is explicitly a contract with and for the benefit of member airlines including American.

57.     Among other provisions, the IATA Passenger Sales Agency Agreement and the ARC Agent Reporting Agreement give rise to and confirm the existence of a principal-agency relationship between the agency and the carrier.

58.     In addition, as part of the agreed provisions in the IATA Passenger Sales Agency Agreement and the ARC Agent Reporting Agreement, Kiwi agreed to comply with all further supplemental instructions and policies in the GTAA Addenda. In relevant part, the IATA Passenger Sales Agency Agreement provides that "all services sold pursuant to this Agreement shall be sold on behalf of the Carrier and in compliance with Carrier's tariffs, conditions of carriage and the written instructions of the carrier as provided to the Agent …." The ARC Agent Reporting Agreement provides that "Agent must comply with all Carrier instructions, and must not make any representation a Carrier has not previously authorized."

59.     As is quoted at length above, the GTAA includes extensive limitations on access and use of American's dynamic, proprietary flight, fare and inventory content: which can be accessed and used only by authorized American agents, and by those authorized agents only for limited purposes and in particular manners.

60.     Further, the GTAA provides that "Agent [such as a consolidator like GTT] will not issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment [such as Kiwi]."

61.     Kiwi confirmed in the 2018 Agency Program Agreement that it would comply with the terms of the GTAA, as applicable.

62.     The Use Agreement, Conditions of Carriage, GTAA, and/or the 2018 Agency Program Agreement expressly prohibited Kiwi's abusive conduct, including holding itself out as American's agent without authority to do so, booking hidden city tickets, booking tickets using Kiwi's own payment information rather than the passenger's, booking tickets using fake customer contact information, and using American's content and intellectual property without consent.

**D.     Distribution and Related Contractual Agreements Between American and Its Agents**

63.     The GTAA prohibit accredited agents from acting as intermediaries for those, like Kiwi, whose ticketing authority American has revoked. The GTAA further prohibit authorized agents from "assisting, aiding, or abetting in any way the unauthorized access, use, distribution or display of American Data" and provides that "[i]f Agent  learns that any third party [such as Kiwi] is accessing, distributing, remarketing or displaying American Data in any way obtained via Agent … without American's written authorization, Agent will promptly inform American and take all commercially reasonable measures, including commercial, technological, or legal measures, to prevent the unauthorized access, display, remarketing or distribution of American Data." The GTAA also provide that "Agent  will not issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment [such as Kiwi]."

**1.     Suspension, Limitation or Termination of Agency Authority**

64.     Under all relevant agreements including the GTAA, American retained the right to suspend Kiwi's ticketing authority or to terminate the agency relationship altogether, within its sole discretion for any or no reason. For example, under the GTAA, American may at any time, on written notice to a travel agency, suspend or limit a travel agency's appointment to act in an agency capacity for American. American was allowed to terminate Kiwi's rights under the 2018 Agency Program Agreement for convenience upon 30-days' notice, and immediately for cause.

65.     Upon suspension or termination of that authority, Kiwi lacked actual authority to access and use American's propriety flight, fare and inventory content. Kiwi also lacked actual authority to sell or issue tickets on behalf of American. Under the GTAA, if its appointment is terminated, "Agent may not act in any agency capacity whatsoever for the sale of American's

products and services from any location." That obligation to refrain from acting as an agent continues to bind the agent after termination. The GTAA also make clear that when a carrier terminates an agency relationship, "all obligations accrued prior to the date of termination" survive.

66.     In February 2022, American publicly announced to all of its authorized agents that American had revoked Kiwi's agency appointment, and directed that all authorized agents, cease issuance of tickets on behalf of Kiwi. GTT therefore has been on notice of Kiwi's termination since at least February 2022, if not before.

### 2.     Hidden City Ticketing

67.     Among other relevant GTAA terms and conditions, agencies agree to refrain from "abusive practices," including hidden city itineraries.

68.     The GTAA prohibit "[m]isuse or manipulation" of travel documents, including issuance "of tickets that are not intended for travel by a bona fide passenger." Further, the GTAA prohibit "issuing/selling a ticket with a fictitious point of origin or destination in order to undercut the applicable fare."

69.     The GTAA provide that "Agent acknowledges that Hidden City . . . and other Fraudulent, Fictitious, or Abusive Bookings, violate American's Rules (See American's Conditions of Carriage for definitions of these types of bookings.)." Under American's conditions of carriage, prohibited booking practices include: "Purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing) … Combining 2 or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing)." Relatedly, Rule 65(A)(3)(a) of American's General Rules of the International Tariff, also linked on AA.com, provides that "Tickets may not be purchased at a fare(s) published from an initial departure point on the ticket which is before the passenger's actual point of origin of travel, or to a more distant

point(s) than the passenger's actual destination being traveled even when the purchase and use of such tickets would produce a lower fare. This practice is known as 'hidden cities ticketing' . . . and is prohibited by AA."

### 3. Failure to Provide Complete Passenger Data

70.     Relevant agreements require agents to provide complete passenger contact and payment information, and prohibit agents from substituting their own information in place of passengers' information.

71.     For example, the GTAA explain that "[c]omplete information in a reservation is important to appropriately service customers during the course of travel and required for governmental compliance programs such as Secure Flight, therefore Agent must provide American with all the contact information offered by customers including but not limited to phone fields and emails as well as any other information required by governmental authorities. Agent may not substitute any contact information or provide Agent's contact information in lieu of such customer information without the consent of American and the customer."

72.     For its part, the ARC Agent Reporting Agreement states that "[i]n the absence of specific permission of a Carrier . . . Agent must process Transactions . . . with the same form of payment provided by the client. . . . Agent must not use a credit card which is issued in the name of the Agent, or in the name of any of the Agent's personnel, or in the name of any third party (other than the client). . . ." The ARC Industry Agent's Handbook, which is incorporated by reference into the ARC Agent Reporting Agreement, further requires agents to "follow the validating airline's rules, policies, and procedures" related to reservations and ticketing, including by providing passengers' telephone contact numbers. Similarly, the IATA Passenger Sales Agency Agreement requires agents to provide passenger contact information to the carriers or "to indicate that the passenger has declined to provide such details."

### 4.      Misuse of Carrier Data

73.       As described in the GTAA, American owns any and all content that, among other things, "identifies or is reasonably identifiable to services or products provided by American, including all fare and inventory information." "Access and use of American Data by the Agent is solely for purposes of and is limited to those activities that are within the scope of the principal-agent relationship as defined and authorized by American."

74.      The GTAA prohibit a variety of misuses of its content, including "accessing AA.com by the use of any automated or electronic devices commonly known in the Internet industry as robots or spiders, or by the use of other electronic search devices," "displaying, distributing, disclosing, or otherwise processing American Data," "engaging in any kind of commercialization, marketing, advertising, licensing or resale that is based on American Data," "facilitating structured posting of American Data to any third party electronic media," and "assisting, aiding, or abetting in any way the unauthorized access, use, distribution or display of American Data, including American Data obtained or derived from an American website or mobile app or any other web site, mobile app or any other source, such as a Global Distribution System."

75.      The GTAA also explicitly prohibit "display[ing] American's products and services via electronic means directly to customers without American's prior written approval."

### 5.      Misuse of Intellectual Property

76.      In addition to the intellectual property protections afforded by federal and state law, the GTAA prevent misuse of American's intellectual property.

77.      The ARC Agent Reporting Agreement provides that "[a]ny website or mobile application owned, operated, or used by an Agent . . . must not include any images containing

Carrier's logo or branded aircraft imaging or other marks, without Carrier's prior written consent."

78.     Under the GTAA, American granted agents a limited permission to use certain American marks and trade dress "solely for the purpose of identifying Agent as an authorized agent of American." Agents, in turn, agreed to "obtain American's written authorization . . . before any use of American's intellectual property." Agents further agreed not to harm, challenge ownership of, or in any way contest or deny the validity of, or the right or title of American in or to the American Marks or American Copyright. They also agreed that a breach of the GTAA's intellectual property provisions "will cause American significant, irreparable injury and that American's legal remedies for a breach will be inadequate."

### 6.      Acting For or Assisting Unauthorized Agents

79.     As mentioned above, the GTAA prohibit accredited and approved agents, including for example GTT, from acting for or assisting terminated, such as Kiwi.

80.     For example, when a carrier terminates its appointment of an ARC-accredited agent, ARC notifies Global Distribution Systems ("GDSs") of the termination "to inhibit issuance of ARC Travel Documents on that Carrier." The ARC Agent Reporting Agreement also makes clear that "[p]ermitting the unlawful or unauthorized access or use of an airline or [GDS] computer-reservations system" constitutes a breach of the ARC Agent Reporting Agreement.

81.     For its part, the GTAA state that "Agent's Appointment is for purposes of the Agent marketing and selling American's products and services directly to customers for those products and services. Agent's Appointment is specific to Agent, and does not include any authority for Agent to act as an intermediary for further distribution of American's products and services via other intermediaries and sales agents." They further provided that "Agent will not

issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment."

      **E.**      **American's Valuable Trademarks and Copyrights**

82. American has developed global name recognition and goodwill. Its brands, trade names, and other intellectual property are the result of significant investment and worth billions of dollars. For decades, American has used and continues to use the trade name "American Airlines" and many trademarks, service marks, and copyrights, including on AA.com. American also has used designs such as its "Flight Symbol" to promote its products and services throughout the world:



83. American uses the "American Airlines" mark and  ("Flight Symbol") design (together, "American Marks"), alone and in combination with other words and designs, in connection with loyalty programs, discount programs, incentive award programs, transportation services, and travel-related goods and services, in interstate commerce.

84. To protect its investment in its intellectual property, American registers the American Marks in the U.S. Patent and Trademark Office ("USPTO") on the Principal Register. American also registers the American Marks in many other countries.

85. The registered American Marks include the following:

| Mark/Name | Reg. No. | Reg. Date | Services |
|---|---|---|---|
| **AMERICAN AIRLINES** | 4939082 | April 19, 2016 | (Int'l Class: 35) Sales promotion; promoting the goods and services of others by means of a loyalty program, discount program, |

and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by member subscribers which can then be redeemed for merchandise and travel; online retail store services featuring gift cards and private club membership; promoting the goods and services of others by means of providing an on-line shopping mall with links to the retail web sites ofothers in the field of books, computers, software,office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise.

(Int'l Class: 37)
Repair and maintenance of aircraft, vehicles, aircraft-related facilities, baggage-related facilities, and air travel-related facilities; refueling of aircraft and land vehicles; ground support services in the field of air transportation, namely, aircraft de-icing services, aircraft interior and exterior cleaning, and sanitation.

(Int'l Class: 39)
air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, namely, coordinating travel arrangements for individuals and for groups, providing air transportation reservation services for others, providing vehicle reservation services for others, providing cruise reservation services for others, and providing vacation reservation services by means of a global computer network, namely, coordinating travel arrangements for individualsand for groups; providing information in the field of travel by means of a global computer network; providing lounge facilities, namely, airport services featuring transit lounge facilities for passenger relaxation and also including shower facilities

(Int'l Class: 41)
Providing online electronic publications, namely,online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of an inflight entertainment system; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music,

| | | | |
|---|---|---|---|
| | | | documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of a personal computer or tablet.<br><br>(Int'l Class: 43)<br>Food and drink catering; providing food and beverage services in conjunction with providing facilities in the form of a private club for conducting business, meetings and conferences; providing conference room facilities, food and beverage lounge facilities, and amenities, namely, food, drink, catering, and restaurant; providing hotel reservation and coordination services for others by means of a global computer network; travel agency services, namely, making reservations and booking for temporary lodging; entertainment services, namely, providing a general purpose arena facility for sports, entertainment, trade shows, exhibitions and conventions. |
| **AMERICAN AIRLINES** | 5279167 | Sep. 5, 2017 | (Int'l Class: 09)<br>computer application software for mobile devices and handheld computers, namely, software for providing information in the fields of travel, transportation and loyalty award programs; computer application software for mobile devices, namely, software for tracking and redeeming loyalty program awards; computer application software for mobile devices and handheld computers, namely, software for ticketing passengers, checking reservations, and checking flight status<br><br>(Int'l Class 38) Providing Internet access |
| **AMERICAN AIRLINES** | 5592865 | Oct. 30, 2018 | (Int'l Class: 36)<br>Issuance of credit cards through a licensee |
| **AMERICAN AIRLINES** | 5573314 | Oct. 2, 2018 | (Int'l Class: 25)<br>Clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear<br><br>(Int'l Class:28)<br>Toys, namely, model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards<br><br>(Int'l Class: 36)<br>Banking; real estate affairs, namely, real estate lending services; aircraft financing; credit union services; financial services for credit union members, namely, financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage, mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and |

| | | | |
|---|---|---|---|
| | | | real estate lending services; Issuance of credit cards through a licensee |
| Design Only  | 4449061 | Dec.10, 2013 | (Int'l Class: 35)<br>promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then be redeemed for merchandise and travel; Online retail store services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership.<br><br>(Int'l Class: 39)<br>air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing transportation reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation transportation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network.<br><br>(Int'l Class: 43)<br>providing travel agency services, namely, providing temporary lodging reservation services for others. |
| Design Only  | 5559145 | Sep.11, 2018 | (Int'l Class: 25)<br>clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear<br><br>(Int'l Class: 28)<br>toys, namely, model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards<br><br>(Int'l Class: 35)<br>promoting goods and services of others by means of loyalty program, discount program, promotional program and an incentive awards program whereby points are earned or awarded for purchases made by members which can then be redeemed for merchandise, services and travel; promoting goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, gift cards, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise; provision, organization, operation, and administration of a loyalty program, a |

discount program, a promotional program and an incentive awards program for customers whereby points are earned for purchases made via credit cards which can be redeemed for merchandise, services and travel; provision, organization, operation, and administration of loyalty, discount, promotional, and incentive programs, namely, managing and tracking the transfer and redemption of points that are earned or awarded for purchases made by members; provision of clerical and secretarial services; providing facilities, office machines and equipment for conducting business, business meetings, and conferences; providing professional support staff to assist in the conducting of office business, meetings and conferences; promotion of travel insurance services of others.

(Int'l Class: 36)
banking; real estate affairs, namely, real estate lending services; aircraft financing; credit union services; financial services for credit union members, namely, financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage, mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and real estate lending services; issuance of credit cards through a licensee

(Int'l Class: 38)
providing internet access

(Int'l Class: 39)
air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services in the nature of coordinating travel arrangements for individuals and groups; providing information in the field of travel; ground support services in the field of air transportation, namely, marking, sorting, loading, unloading, transfer, and transit of cargo and passengers' luggage; providing information concerning cargo and passengers' luggage in transit and delivery; air travel passenger ticketingand check-in services; airport ramp services; transporting aircraft at airport; providing aircraft parking and storage; aircraft towing; transportation services, namely, checking of baggage; airport services featuring transit loungefacilities for passengers; booking and providing ancillary travel services, namely, making reservations in the nature of seat selection, baggage check-in; airport ramp services, namely,transfer of checked baggage to aircraft; airport ramp services, namely, transfer of carry-on baggage to aircraft; airline services, namely, providing priority boarding for customers, and access to

| | | | |
|---|---|---|---|
| | | | airport lounge facilities; air passenger wheel-chair services at airport; leasing of aircraft; leasing of components of aircraft; leasing of aircraft engines; transporting of aircraft engines for others; airport services featuring transit lounge facilities for passengers.<br><br>(Int'l Class: 41)<br>providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight and airport lounge entertainment services, namely, providing movies, audio and audio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, audio books, tablets, video and online games, and children's programming; travel services, namely, providing headphones on aircraft for use for entertainment purposes<br><br>(Int'l Class: 43)<br>providing conference rooms; food and drink catering; café services; restaurant services; bar services; providing conference room facilities; providing lounge facilities for providing food and drink; providing hotel reservation and coordination services for others; hotel services; restaurant services, namely, providing of food and drink in airports and on aircraft<br><br>(Int'l Class: 45)<br>facilitating expedited passenger screening, namely, providing priority access to airline passenger and baggage security screening |
| | 5441150 | April 10, 2018 | (Int'l Class: 36)<br>issuance of credit cards through a licensee |
| AMERICAN and Design<br><br>American | 5288639 | Sep. 19, 2017 | (Int'l Class: 35)<br>sales promotion; promoting the goods and services of others by means of loyalty program, discount program, and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by member subscribers which can then be redeemed for merchandise and travel; online retail store services featuring gift cards and private club membership; promoting the goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the fields of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related |

| | | | items, and general retail merchandise<br><br>(Int'l Class: 39)<br>air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, namely, coordinating travel arrangements for individuals and for groups, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services by means of a global computer network, namely, coordinating travel arrangements for individuals and for groups; providing information in the field of travel by means of a global computer network |
|---|---|---|---|

86.     American also has protected its investment in its brand by registering designs with the U.S. Copyright Office. It owns U.S. Copyright Registration No. VA00002130520 for its Flight Symbol design ("American Copyright").

87.     In addition to its registered rights, American has strong common-law rights in the American Marks and American Copyright by virtue of extensive use and promotion in commerce.

88.     The American Marks and American Copyright serve as unique and famous source identifiers for American and various travel services.

89.     American has invested millions of dollars in worldwide advertising and marketing to build the fame, reputation, and goodwill of the American Marks and American Copyright. It advertises through a variety of media, including television, the internet, radio, newspapers, magazines, and direct mail, across the country and the world.

90.     The American Marks and American Copyright are distinctive designations of the source of origin of American's services. They are uniquely associated with it and its high-quality goods and services and are assets of incalculable value as symbols of American, its quality goods and services, and its goodwill.

91.     The American Marks and American Copyright are "famous" within the meaning of the dilution provisions of the Lanham Act, 15 U.S.C. § 1125(c), and became famous before Kiwi's infringement began.

92.     As a result of American's extensive and continuous advertising, promotional, and use of the American Marks and American Copyright, they are famous, distinctive, and widely recognized by the general consuming public of the United States as a designation of the source of the involved goods and services.

**F.      Kiwi's Abusive Practices and Breaches of Contract and Agency Duties**

93.     As an authorized agent for American, Kiwi gained access in 2018 to American's valuable real-time flight, ticket-pricing and inventory content, and gained the right to sell American tickets and related flight services as American's agent. But within less than a year, Kiwi was flouting numerous rules and requirements of the GTAA. These abusive actions were in breach of the agreements, significantly harmed American's customers—through consumer confusion, disruptions in services, and operational delays and problems—and likewise damaged American's relationships and reputation with its customers.

94.     Among other things, Kiwi was engaging extensively in sales of American flights/fares using prohibited hidden cities itineraries. Kiwi also was extensively engaging in a practice it calls "virtual interlining," which was damaging to American and deceptive to passengers.

95.     American discussed these problems with Kiwi in 2019, to give Kiwi a chance to mend its ways, but to no avail. American therefore notified Kiwi in 2020 that it was terminating Kiwi's authorization to sell American flights and fares, as American was entitled to do under the GTAA.

96.     But Kiwi was undeterred. Despite lacking any authority to access and use American's flight and fare information, Kiwi found improper means to do so. Likewise without authority to sell American's flights and fares as American's agent, Kiwi continued to do so: displaying American's flights and trademarks on its website as if it were still authorized as American's agent, and selling American flights by various subterfuges, thereby continuing to harm American and American's customers. Kiwi's misconduct is ongoing and continues today; an injunction is the only means to stop it.

### 1.     Accessing and Using American's Content

97.     Despite lacking any agency or other authority to access and use American's valuable, dynamic inventory, schedule and fare information, Kiwi has located an unauthorized backchannel and improperly uses it. The content misappropriated and misused by Kiwi is not static, nor merely the data that might appear on AA.com, but rather is dynamic, changing in real time, and is proprietary and non-public. Kiwi then uses that content to feed its website, permitting Kiwi's customers to query it while financially benefiting Kiwi. Kiwi also improperly accesses American's content through consolidators like GTT, which allow Kiwi, without authorization from American, to use their systems to sell American tickets.

### 2.     Booking Through AA.com

98.     By one unauthorized means, Kiwi sells American's flights to Kiwi customers through American's direct-to-consumer website, AA.com. But in doing so, Kiwi violates numerous terms and conditions of the AA.com Use Agreement and the Conditions of Carriage, as well as the GTAA:

a.  Kiwi uses AA.com for commercial, not personal use;

b.  Kiwi actively encourages and books hidden city tickets;

c. Kiwi books for others who are not family members or work supervisors, the only exceptions under the Use Agreement where someone is permitted to book for another person; and

d. When Kiwi books for a passenger, it does not supply the passenger's actual credit card information and contact email address, using instead Kiwi's own fictitious and hard-to-trace payment information and auto-generated email addresses.

99. These violations harm consumers and harm American in multiple ways. American's system builds itineraries with minimum connection times built in to allow enough time to transfer to a connecting flight under normal flight conditions. Kiwi's abusive tactics circumvent this, and other, safeguards. As a result:

a. When a passenger arrives late for the final segment of a flight, American might delay the flight unnecessarily while looking for the passenger;

b. If the passenger still doesn't show, American needs to determine whether the passenger has checked luggage through to the final destination, because if the passenger has, the luggage needs to be removed from the plane as a serious safety matter;

c. Planes are fueled based on the passenger count, and if passengers don't show up, the plane flies with an empty seat, meaning the plane burns carbon without an offsetting consumer benefit;

d. Without passenger contact information, American is unable to communicate with passengers concerning canceled or delayed flights, gate changes, and the like;

e. Without passenger credit card information, American is unable to refund the passenger directly, and the customer instead needs to chase down her refund from Kiwi, because American generally issues refunds by way of credit to the original source of payment (in this case, the credit card information that Kiwi supplied).

100. Kiwi also misleads its and American's customers, leading to significant potential problems for those customers and for American. For example, Kiwi often collects its own luggage charges for checked bags, without any arrangement with American. Kiwi does so even in situations where American itself does not charge for checked bags. Kiwi also does so in situations

where American itself charges for luggage, but Kiwi does not use the fees it collected to cover American's charges. A customer then ends up thinking that she paid for her bags, but arrives at the airport and is told that she has not.

### 3. Unauthorized Booking Through Other Agencies and Shadow PCCs

101.    By an alternative avenue, when Kiwi does not book through AA.com, Kiwi has moved underground and hidden its activities, operating for example by selling tickets without authorization using PCCs of consolidator agencies, including GTT, that Kiwi apparently has formed relationships with. These shadow sales appear to American to be sales made by the consolidator agency, not Kiwi, but ultimately are funneled to Kiwi and passed on to Kiwi's customers.

102.    Despite Kiwi's efforts to evade detection, and with significant effort, American has been able to determine that Kiwi sold hundreds of tickets, in 2022 alone, using GTT's PCCs, apparently based on some undisclosed arrangement between Kiwi and GTT. Sales made by Kiwi using GTT's PCCs are designed to appear as if they are authorized sales by GTT, but in fact the tickets are ultimately sold to Kiwi's customers resulting in financial benefit to Kiwi. On information and belief, this financial benefit is shared with GTT in some contractual or other form.

103.    As another example, in ARC's records, Kiwi's Director of Content, Ondrej Cikanek  (https://jobs.kiwi.com/blog/our-people/my-kiwi-story-ondrej-cikanek/)  is  listed  as  a contact for Russia House Inc. dba KW Travel ("Russia House"). *See* image below. The phone number that is listed with the (404) Atlanta area code connects to a consolidator agency called www.TravelPapa.com. Thus, it appears that Kiwi has embedded one or more of its key employees into one or more consolidators (Russia House, TravelPapa.com, and probably others). By this

means, Kiwi presumably is booking flights through those consolidators, to try to cover its tracks, and to book and sell flights without authorization.



104.    On information and belief, Kiwi has undisclosed arrangements with additional consolidator agencies by which Kiwi improperly sells American tickets using the PCCs of those agencies.

105.    These shadow sales by Kiwi induce breaches of GTAA provisions by which authorized consolidators, such as GTT, have agreed not to issue tickets for any unauthorized agency. As with Kiwi's purchases made on AA.com, Kiwi's unauthorized shadow sales made through authorized consolidators often have been of hidden city tickets, and have caused similar problems for passengers and American.

### G.    Kiwi's Violation of American's Intellectual Property

106.    In addition, in connection with unauthorized sales of American flights/fares, Kiwi has made and still makes extensive, unauthorized use of the American Marks and American Copyright, prominently displaying the terms "American Airlines" and using American's "Flight

Symbol" design across Kiwi.com, as shown by the screen-capture below of a Kiwi.com webpage

for an American flight:



In fact, Kiwi.com appears to have an *entire page* dedicated to American, which liberally deploys

American's marks and effectively pretends it is an authorized online travel agency and American

partner.





107.   Kiwi's business model involves unauthorized sales practices that harm American and risks confusing American's customers into believing that they are dealing with an authorized agent.

108.   Among other things, Kiwi directly promotes the sale of "hidden city" tickets. Those tickets provide itineraries where the passenger's actual, intended destination is not the ticketed final destination but rather an intermediate or connecting city—and the passenger never makes use of the final leg of the journey. Kiwi advertises hidden-city ticketing as a "travel hack" because the price for such tickets may be lower than the price of a ticket to the passenger's actual, intended destination. This booking practice, however, violates the contract that American requires all travel agencies to agree to before it grants them limited authority to sell tickets for American,

as well as American's Conditions of Carriage, which expressly prohibit the sale of "hidden city" tickets. Kiwi's own website advertises its "hidden city" program.



It is a touted feature of Kiwi's business, and a touted differentiator.

109.    Hidden city ticketing negatively impacts American's revenue, operations, and customers. Hidden city ticketing also causes problems with checked baggage because American must check baggage to the final destination, not the connecting city. If a connecting passenger does not show up, American needs to ensure than any luggage checked to the final destination is removed from the plane, as an important safety matter. Moreover, operational employees and flight crews face wasted time, flight delays, and other disruptions trying to locate missing customers listed on the connecting flight's manifest. And it can even delay flights when airlines wait for passengers who never intended to show up to board.

110.    American repeatedly has notified Kiwi of its abusive conduct and demanded that it stop. In every instance, Kiwi has ignored American or otherwise failed to stop, continuing without authorization to book flights using American's trademarks and American's copyright. Throughout this period, American has received employee reports and customer complaints about

problems and challenges presented by tickets purchased through Kiwi, including operational disruptions caused by Kiwi sales of hidden-city flights and use of virtual interlining. Among other measures, American tries to identify and cancel bookings associated with Kiwi.com. But despite American's efforts to protect itself, Kiwi continues to find ways to view fares and sell flights without authorization.

111.   Kiwi's improper actions have caused American considerable harm. Unsurprisingly, when things go wrong with Kiwi-booked tickets, American gets blamed for Kiwi's problems—even where those problems are caused by Kiwi's own deceptive and improper practices. Kiwi's liberal and unauthorized use of American's protected intellectual property suggests falsely that American is working *with* Kiwi, authorizing their activities, and will assist customers when Kiwi's practices do customers harm. American then loses *more* revenue when it tries to help solve its customers' Kiwi-created problems. American has spent nine decades building trust with its customers and investing to make its brand one of the premier airlines in the world.  But Kiwi's unlawful, unauthorized activity threatens and erodes that investment, potentially irreparably.

112.   In the last two years, American has expended significant employee time and resources investigating and trying to address the problems caused by Kiwi's abusive practices. American employees based in this District have spent hundreds of hours in the last year to identify unauthorized Kiwi bookings and develop safeguards. American's customer relations employees have been forced to address many complaints from customers who booked flights through Kiwi, in some cases having to pay compensation to customers for lost or delayed bags or other disruptions.

113.    Given this abusive business model, other airlines have tried to stop Kiwi. For example, American, British Airways, Finnair, Iberia, and KLM have all suspended or terminated Kiwi's ticketing privileges, and have prohibited Kiwi from displaying those airlines' flight content. Southwest Airlines secured preliminary and permanent injunctions in this District against Kiwi for certain related abusive practices. *See Southwest Airlines Co. v. Kiwi.com, Inc.*, 3:21-cv-98, 2021 WL 4476799 (N.D. Tex. Sept. 30, 2021) (preliminary injunction); *id*. at Dkt. No. 126 (permanent injunction). By this action, American seeks similar injunctive relief and monetary damages.

## COUNT I

### (Breach of AA.com Use Agreement and Conditions of Carriage)

114.    American realleges the material factual allegations in the preceding paragraphs.

115.    Use of AA.com is governed by and subject to the Use Agreement.

116.    At all relevant times, legal, privacy and copyright provisions, including the Use Agreement and American's Conditions of Carriage, have been accessible by links starting from AA.com's main homepage. Kiwi's own website, Kiwi.com, likewise has Terms of Use, and General Terms and Conditions, accessible by links, and which purport to create a contract between Kiwi and its customers.

117.    AA.com's Use Agreement states, "In return for gaining access to the Site and using it, you agree to be bound by the following Agreement …. If you do not intend to be legally bound by these terms and conditions, do not access and use the Site." Thus, by accessing and using, and booking tickets through, AA.com, the Use Agreement is a valid agreement binding on Kiwi.

118.    As a party to the Use Agreement, American is entitled to sue for a breach of the agreement. American has met all conditions precedent to and otherwise complied with the contract.

119.    Among other things, the Use Agreement prohibits use of the site to "engag[e] in any commercial purpose," including to "copy, display, distribute, download, . . . publish, . . .reuse, sell, transmit, . . . or otherwise use the content of the site for public or commercial purposes."

120.    The Use Agreement also prohibits use of AA.com to make "any fictitious, fraudulent, or abusive reservation," which is defined in the incorporated Conditions of Carriage to include "[p]urchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing)."

121.    The Use Agreement also prohibits use of the site to "[a]ct as an agent . . . for any person who is not a member of your immediate household; or your direct supervisor at your place of employment."

122.    In violation of Use Agreement, the Conditions of Carriage, and American's General Rules of the International Tariff, Kiwi has and continues to access AA.com to, among other things, engage in a commercial purpose by selling American tickets to Kiwi's customers, sell hidden city tickets, and act on behalf of passengers who are not members of the immediate household of the individual using the site or for that person's direct work supervisor. Kiwi's misconduct is ongoing and continues today.

123.    Kiwi's actions have damaged, and will continue to cause damage, to American.

124.    Kiwi's acts also have caused and, unless and until such acts are enjoined by this Court, will continue to cause, great and irreparable injury to American for which American has no adequate remedy at law.

## COUNT II

## (Breach of GTAA)

125.    American realleges the material factual allegations in the preceding paragraphs.

126.    In or about 2016, Kiwi applied for and obtained IATA accreditation. That accreditation remains in effect today.

127.    As an IATA-accredited agent, Kiwi became and remains bound by the IATA Passenger Sales Agency Agreement. The IATA Passenger Sales Agency Agreement provides in relevant part that "this Agreement shall become effective between the Agent and the Carrier upon appointment of the Agent by such Carrier in accordance with the Sales Agency Rules in effect in the country(ies) of the Agent's Location(s). Upon coming into effect this Agreement, including any amendments thereto, shall have the same force and effect between the Carrier and the Agent as though they were both named herein and had both subscribed their names as parties hereto."

128.    In or around 2016, American appointed Kiwi as an authorized agent through the applicable IATA Passenger Sales Agency Rules.

129.    In or around 2020, American terminated Kiwi's rights to sell American tickets. The IATA Passenger Sales Agency Agreement provides that when a carrier terminates an agency relationship, "all obligations accrued prior to the date of termination" survive.

130.    Kiwi, however, remained accredited by IATA and subject to IATA's Passenger Sales Agency Agreement. Moreover, since Kiwi has continued to execute unauthorized shadow sales of American tickets through consolidator agencies who are IATA-accredited and authorized to sell American tickets, Kiwi has executed those sales subject to the terms and conditions of the IATA Passenger Sales Agency Agreement.

131.    American is entitled to sue for a breach of the IATA Passenger Sales Agency Agreement as a party to the agreement. In addition or in the alternative, American is entitled to

sue for a breach of the IATA Passenger Sales Agency Agreement as an intended third-party beneficiary of the agreement between Kiwi and IATA.

132.    The IATA Passenger Sales Agency Agreement prohibits "issuing/selling a ticket with a fictitious point of origin or destination in order to undercut the applicable fare."

133.    The IATA Passenger Sales Agency Agreement further requires agents to provide passenger contact information to the carriers or "to indicate that the passenger has declined to provide such details."

134.    In addition to its obligations under the IATA Passenger Sales Agency Agreement, to the extent that Kiwi has executed unauthorized sales of American tickets through consolidator agencies who are ARC accredited—such as GTT, KW Travel and TravelPapa.com—Kiwi thereby assumed and became bound to, and is estopped from avoiding, all of the limitations and obligations in the ARC Agent Reporting Agreement.

135.    American is entitled to sue for a breach of the ARC Agent Reporting Agreement as a party to the agreement. In addition or in the alternative, American is entitled to sue for a breach of the ARC Agent Reporting Agreement as an intended third-party beneficiary.

136.    The ARC Agent Reporting Agreement prohibits "[m]isuse or manipulation" of travel documents, including issuance "of tickets that are not intended for travel by a bona fide passenger."

137.    The ARC Agent Reporting Agreement also requires that "[i]n the absence of specific permission of a Carrier . . . Agent must process Transactions . . . with the same form of payment provided by the client. . . . Agent must not use a credit card which is issued in the name of the Agent, or in the name of any of the Agent's personnel, or in the name of any third party (other than the client) …."

138.    The ARC Industry Agent's Handbook, which is incorporated by reference into the ARC Agent Reporting Agreement, further requires agents to "follow the validating airline's rules, policies, and procedures" related to reservations and ticketing, including by providing passengers' telephone contact numbers.

139.    The ARC Agent Reporting Agreement further provides that "[a]ny website or mobile application owned, operated, or used by an Agent . . . must not include any images containing Carrier's logo or branded aircraft imaging or other marks, without Carrier's prior written consent."

140.    In addition to Kiwi's obligations under the IATA Passenger Sales Agency Agreement and the ARC Agent Reporting Agreement, Kiwi also is bound pursuant to the terms of both of those agreements by the GTAA.

141.    The IATA Passenger Sales Agency Agreement provides that "all services sold pursuant to this Agreement shall be sold on behalf of the Carrier and in compliance with Carrier's tariffs, conditions of carriage and the written instructions of the carrier as provided to the Agent …."

142.    The ARC Agent Reporting Agreement provides that "Agent must comply with all Carrier instructions, and must not make any representation a Carrier has not previously authorized."

143.    The GTAA provide that if an agent's appointment is terminated, "Agent may not act in any agency capacity whatsoever for the sale of American's products and services from any location." That obligation to refrain from acting as an agent continues to bind the agent after termination.

144.     The GTAA also prohibit unauthorized access to, redistribution or other misuse of American's content, including all inventory, schedule and fare information. Misuse includes, among other things, displaying or commercializing American's content.

145.     The GTAA also prohibit hidden-city ticketing.

146.     The GTAA also require agents to provide all required passenger contact information and prohibit an agent from substituting its own contact information for a passenger's.

147.     The GTAA also prohibit unauthorized use of American intellectual property, including American marks, trade dress, and copyright.

148.     As described in more detail above, Kiwi breached and continues to breach these and other provisions of the IATA Passenger Sales Agency Agreement, the ARC Agent Reporting Agreement, and the GTAA. Kiwi's misconduct is ongoing and continues today.

149.     American has met all conditions precedent to and otherwise complied with the contract.

150.     Kiwi's actions have damaged, and will continue to cause damage, to American.

### Count III

### (Tortious Interference with American's Contracts with Authorized Agents)

151.     American realleges the material factual allegations in the preceding paragraphs.

152.     American has valid contracts with authorized consolidator travel agents such as GTT who are bound by the GTAA.

153.     The GTAA prohibit authorized agents such as GTT from "assisting, aiding, or abetting in any way the unauthorized access, use, distribution or display of American Data" and provide that "[i]f Agent [such as GTT] learns that any third party [such as Kiwi] is accessing, distributing, remarketing or displaying American Data in any way obtained via Agent … without American's written authorization, Agent will promptly inform American and take all

3775604_1.docx
50

commercially reasonable measures, including commercial, technological, or legal measures, to prevent the unauthorized access, display, remarketing or distribution of American Data."

154.    The GTAA also provide in relevant part that "Agent will not issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment." In addition, the GTAA prohibit certain practices, including hidden city ticketing.

155.    As alleged above, Kiwi's agency authority was terminated. Yet Kiwi, without authorization, has obtained access to American's flight, fare and inventory content including on information and belief from consolidators through which it sells American tickets. Kiwi relatedly, without authorization, has executed shadow sales of American tickets using PCCs of consolidator agencies such as GTT, Russia House, and TravelPapa, who are ARC-accredited and/or IATA-accredited, and who are authorized to sell American tickets.

156.    By obtaining such access to American's proprietary content, and by these sales, Kiwi has induced breaches of the authorized agencies' obligations under the GTAA. In addition to GTT, Russia House and TravelPapa, on information and belief Kiwi has arrangements with other agencies to use improperly their PCCs to sell tickets, and those arrangements and sales likewise induce breaches of these additional agencies' obligations under the GTAA.

157.    Kiwi is willfully, knowingly, and intentionally interfering with American's contracts with those authorized agencies by obtaining American's flight, fare and inventory content from those third parties, causing the third party authorized agencies to breach their obligations to American, and/or purposefully interfering with the third parties' ability to perform their contractual obligations.

158.    Kiwi carried out this interference in furtherance of an unlawful scheme to market and sell American flights without authorization.

159.    Kiwi's conduct is unlawful, deceptive, misleading, and fraudulent.

160.    Kiwi's misconduct is ongoing and is harmful to American's customers, business, and reputation. Kiwi's acts have caused and, unless and until such acts are enjoined by this Court, will continue to cause, great and irreparable injury to American for which American has no adequate remedy at law.

161.    Kiwi's conduct also has proximately caused actual damages to American.

162.    Kiwi should be required to pay damages, to disgorge profits derived from its misconduct, and to pay punitive damages for its misconduct.

### COUNT IV

### (Trademark Infringement under 15 U.S.C. § 1114)

163.    American realleges the material factual allegations in the preceding paragraphs.

164.    The American Marks are inherently distinctive and continue to acquire distinctiveness and goodwill in the marketplace through American's use of those marks in commerce. As a result of its widespread and continuous use, American Marks have become associated in the minds of travelers and travel loyalty program users with American.  The reputation and goodwill that it has built up in American Marks is of great value to American.

165.    The types of services for which Kiwi uses American Marks are identical or substantially similar to services offered by American.

166.    Kiwi's conduct—including its prominent use of American Marks in conjunction with promoting and selling American flights—has caused and is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Kiwi with American, or as to the origin, sponsorship, or approval of Kiwi's goods and services by American.

167. The acts of Kiwi constitute infringement of one or more American Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

168. American has sustained injury, damage, and loss based on Kiwi's infringement.

169. American is entitled to monetary damages for Kiwi's infringement.

170. Kiwi has acted with knowledge of American's ownership of the American Marks and with a deliberate intent or willful blindness to unfairly benefit from the goodwill symbolized by the marks. Kiwi willfully infringed one or more of the American Marks, and the intentional nature of Kiwi's actions makes this case exceptional under 15 U.S.C. § 1117(a).

171. American also has suffered and will continue to suffer irreparable harm as a result of Kiwi's infringement of the American Marks. Unless enjoined by this Court pursuant to 15 U.S.C. § 1116, Kiwi will continue to infringe the American Marks. American has no adequate remedy at law for Kiwi's infringement.

## COUNT V

### (Copyright Infringement under 17 U.S.C. § 101)

1. American realleges the material factual allegations in the preceding paragraphs.

2. American has a copyright registration for the American Copyright, Reg. No. VA0002130520 / 2016-06-03. The copyright is valid and enforceable.

3. Kiwi had access to the American Copyright because it is published on AA.com and on other places on the Internet and because Kiwi applied for and obtained accreditation from IATA and entered into the GTAA. Kiwi copied the American Copyright and displays it on its website.

4. In copying the American Copyright, Kiwi violated U.S. copyright laws, specifically 17 U.S.C. § 101, *et seq.* Kiwi willfully infringed upon the American Copyright.

5.      American has been, is now, and will be irreparably harmed by Kiwi's copyright infringement and, unless enjoined by the Court pursuant to 17 U.S.C. § 502, Kiwi will continue to infringe the American Copyright and cause harm and irreparable injury to American for which American has no adequate remedy at law.

6.      American has sustained injury, damage, and loss based on Kiwi's infringement. American is entitled to statutory damages, including for Kiwi's willful infringement.

## COUNT VI

### (Texas State Law Claims for Common-Law Unfair Competition)

7.      American realleges the material factual allegations in the preceding paragraphs.

8.      American has common law rights under Texas law to the American Marks. American adopted and continuously used the American Marks in connection with its goods and services, and American's Marks are distinctive.  Kiwi has been using American's Marks with the intent to mislead the public and lead to confusion and mistake, including attempting to pass off goods and services as being American's.  Kiwi's actions constitute common-law trademark infringement and unfair competition under Texas law.

9.      American has been, is now, and will be irreparably harmed and has no adequate remedy at law for Kiwi's dilution of American's common-law trademark rights.

## COUNT VII

### (False Designation of Origin and Unfair Competition under 15 U.S.C. § 1125(a))

10.     American realleges the material factual allegations in the preceding paragraphs.

11.     American has federal trademark rights in the American Marks.

12.     Kiwi is displaying and using the American Marks in interstate commerce purporting to act as an online travel agency for American but with no authorization to sell and re-sell American flights on Kiwi's website.

13.     Kiwi's conduct did and is likely to cause confusion, mistake, or deception as to its affiliation, connection, or association with American, or as to the origin, sponsorship, or approval of Kiwi's goods and services by American.

14.     Kiwi's acts constitute false designation of origin, which is likely to cause and have caused confusion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

15.     The intentional nature of Kiwi's actions entitles American to recover profits, damages, and attorney fees under 15 U.S.C. § 1117(a).

16.     Kiwi's actions did and will continue to cause irreparable injury to American for which it has no adequate remedy at law, as well as monetary harm. Kiwi's acts damage American by undermining consumers' association of the American Marks with American. Unless enjoined by the Court pursuant to 15 U.S.C. § 1116, Kiwi will continue to misrepresent and mislead the public that its services are in some manner connected with, sponsored by, affiliated with, related to, or approved by American. Accordingly, American is entitled to injunctive relief.

17.     American has sustained injury, damage, and loss based on Kiwi's actions.

### ATTORNEY FEES

18.     American realleges the material factual allegations in the preceding paragraphs.

19.     American was required to retain legal services in prosecution of these claims. Pursuant to at least Tex. Civ. Prac. & Rem. Code § 38.001, American seeks its reasonable and necessary attorney fees.

**CONDITIONS PRECEDENT**

20.    All conditions precedent to these claims have been performed by American, been waived, or occurred.

**APPLICATION FOR INJUNCTIVE RELIEF**

21.    Kiwi's ongoing actions in violation of its contracts, the Lanham Act and the Copyright Act, have caused, and are continuing to cause, substantial and irreparable damage to American for which there is no adequate remedy at law. Kiwi did and will continue to improperly use the American Marks and American Copyright, unless this Court prevents Kiwi from doing so. American will continue to lose control over its own reputation and goodwill, and the public and consumers likely will continue to be confused, misled, and deceived by the fact that Kiwi offers services under the American Marks and American Copyright without authorization.

22.    American requests that Kiwi, all companies owned or controlled by Kiwi directly or indirectly, their employees, representatives, agents, members, and others acting in concert with them, be permanently enjoined from publishing American flight/fare content on any website, including Kiwi.com, through Kiwi's mobile applications, or elsewhere; selling or re-selling American flights, fares, or other products through any channel including but through AA.com or authorized American agents; accessing or using AA.com or its content for any commercial purpose; otherwise accessing or using American's proprietary flight, fare and/or inventory content from any source or for any purpose; holding itself out or continuing to act in an agency capacity for American; or displaying or otherwise using the American Marks or American Copyright, in violation of U.S. law.

23.    American also requests pursuant to Fed. R. Civ. P. 65(d)(2)(C) that all persons who are in active concert or participation with Kiwi, including GTT, be permanently enjoined

from providing Kiwi with American flight, fare and/or inventory content, from selling American tickets to or for the benefit of Kiwi or Kiwi's customers, from executing or clearing sales of American tickets for Kiwi, from transacting payment transactions with or for the benefit of Kiwi in relation to any purchases or sales of American tickets, or otherwise assisting Kiwi in relation to access to American flight, fare and/or inventory content, or purchases or sales of American tickets.

## PRAYER FOR RELIEF

Therefore, American respectfully requests an order and/or judgment awarding American:

a. a permanent injunction requiring Kiwi, and others assisting, or acting for or in concert with Kiwi, including GTT, to comply with the restrictions set forth above;

b. an accounting of all sales of American flights made by Kiwi, directly or indirectly, since its agency authority was terminated in 2020;

c. an accounting of all sales of American flights made by Kiwi through GTT, since Kiwi's agency authority was terminated in 2020;

d. disgorgement of all ill-gotten or unjust revenues, profits, and benefits that Kiwi derived as a result of its misconduct;

e. statutory damages, including pursuant to 15 U.S.C. § 1117(c) and (d), and 17 U.S.C. § 504(c);

f. all actual damages that American has incurred due to Kiwi's actions, including compensatory and consequential damages, as well as exemplary damages due to Kiwi's willful conduct;

g. prejudgment and post-judgment interest at the highest rates allowed by law;

h.   costs and attorney fees, including for any appeal; and

i.   all other relief to which American is justly entitled at law or in equity.

Dated: July 25, 2023                               Respectfully submitted,

                                                   */s/ Dee J. Kelly, Jr.*
                                                   Dee J. Kelly, Jr.
                                                   State Bar No. 11217250
                                                   dee.kelly@kellyhart.com
                                                   Lars L. Berg
                                                   State Bar No. 00787072
                                                   lars.berg@kellyhart.com
                                                   Tyson Lies
                                                   State Bar No. 24087927
                                                   Tyson.lies@kellyhart.com
                                                   Julia G. Wisenberg
                                                   State Bar No. 24099146
                                                   Julia.wisenberg@kellyhart.com
                                                   KELLY HART & HALLMAN LLP
                                                   201 Main Street, Suite 2500
                                                   Fort Worth, Texas 76102
                                                   (817) 332-2500

                                                   Nathan J. Muyskens
                                                   nathan.muyskens@gtlaw.com
                                                   GREENBERG TRAURIG, LLP
                                                   2101 L Street, N.W., Suite 1000
                                                   Washington, DC 20037
                                                   Telephone: 202-331-3100
                                                   Facsimile: 202-331-3101
                                                   (*pro hac vice application forthcoming*)

                                                   Cameron M. Nelson
                                                   nelsonc@gtlaw.com
                                                   GREENBERG TRAURIG LLP
                                                   77 West Wacker Drive, Suite 3100
                                                   Chicago, IL 60601
                                                   Telephone: (312) 456.6590
                                                   Facsimile: (312) 456-8435
                                                   (*pro hac vice application forthcoming*)

                                                   **ATTORNEYS FOR PLAINTIFF**
                                                   **AMERICAN AIRLINES, INC.**

APPENDIX A

| Acronym | Description |
| --- | --- |
| ARC | Airlines Reporting Corporation. An industry association which accredits domestic (United States) travel agents. By accreditation, domestic travel agents agree to certain standard-form terms to govern their relationship with carriers who appoint them, and also agree to each carrier's additional specific terms and conditions. |
| GDS | Global Distribution System. An organization like Sabre, Amadeus and Travelport that aggregates flight and fare content across carriers. The content is made available to travel agents according to contracts negotiated between each carrier and the GDS. |
| GTAA | Governing Travel Agency Agreements. Standard-form terms that govern the relationship between accredited travel agents and the carriers who appoint them, inclusive of supplemental terms published by carriers applicable to their authorized agents. |
| IATA | International Air Transport Association. An airline industry association which accredits international (ex-United States) travel agents. By accreditation, international travel agents agree to certain standard-form terms to govern their relationship with carriers who appoint them, and also agree to each carrier's additional specific terms and conditions. |
| PCC | Pseudo City Codes. Codes used in respect of GDS-processed airline tickets to designate a particular office or location of a travel agency that is issuing the tickets. |
| SABRE | Semi-Automatic Business Research Environment. One of the GDSs, originally started by American but later spun off into an independent organization. |
| USPTO | United States Patent and Trademark Office. |

JS 44   (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

AMERICAN AIRLINES, INC.

**DEFENDANTS**

KIWI.COM, INC. and KIWI.COM, S.R.O.

**(b)** County of Residence of First Listed Plaintiff   Tarrant
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dade
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Dee J. Kelly, Jr. and Lars Berg, Kelly Hart & Hallman LLP, 201 Main St., #2500, Fort Worth, TX 76102 (817) 332-2500

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[x] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 1121(a), and 28 U.S.C. §§ 1331 and 1338
Brief description of cause:
trademark, copyright breach of contract

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
July 25, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Dee J. Kelly, Jr.

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____